**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         **Plaintiff,**<br><br>         **v.**<br><br>LORENZO BACA,<br><br>                        **Defendant.** | 1:08-CR-00080-OWW<br><br>**STATEMENT OF DECISION AND ORDER REGARDING APPEAL FROM MAGISTRATE JUDGE DECISION (DOC. 86)** |

## I.  INTRODUCTION

Lorenzo Baca ("Appellant" or "Baca") appeals his convictions following a bench trial by a magistrate judge for (1) engaging in a business in a national park in violation of 36 C.F.R. § 5.3; and (2) for traversing a cultural resource in violation of 36 C.F.R. § 2.1(a)(5).  Baca raises three issues on appeal: (1) that the magistrate judge abused his discretion in refusing to recuse himself for creating the appearance of a lack of impartiality; (2) that there was insufficient evidence to support either conviction; and (3) an affirmative defense to the § 2.1(a)(5) charge, established under the American Indian Religious Freedom Act, 42 U.S.C.A. § 1996, applies because as a spiritual leader, he was entitled to enter the cultural resource.  Appellee, the United States of America ("Government"), opposes the appeal.

## II.  PROCEDURAL HISTORY

The Government charged Baca with violating (1) 36 C.F.R. § 2.1(a)(5), trespassing on a cultural resource, (2) 36 C.F.R. § 5.5(a), filming a motion picture in a national park without a permit, and (3) 36 C.F.R. § 5.3, engaging in or soliciting business in a national park.  On December 13, 2005, Baca moved to disqualify the magistrate judge and the motion was denied.  The bench trial began August 15, 2007 and continued through August 17, 2007.  After the Government rested its case, August 17, 2007, Baca's motion for judgment of acquittal was denied.  On August 20, 2007, Baca was out of the court due to illness, and the court adjourned until November 14, 2007.  At this time, Baca again moved to disqualify the magistrate judge on different grounds based on information Baca learned from an August 10, 2007 newspaper article, which Baca had occasion to read during the recess.  In that article, the magistrate judge was photographed in his chambers standing next to a hangman's noose.  The motion was denied and trial resumed.  On November 16, 2007, Baca was found guilty of engaging in or soliciting business in a national park in violation of 36 C.F.R. § 5.3 and trespassing on a cultural resource in violation of 36 C.F.R. § 2.15(a)(5).  Baca was acquitted of the charged violation of filming a motion picture in a national park without a permit, 36 C.F.R. § 5.5(a).

Baca was sentenced to 198 hours of community service, payment of a statutory assessment in the amount of $20, unsupervised probation for 12 months, and ordered to post-conviction booking.  (Doc. 41.)  On March 14, 2008, Baca moved to stay his sentence pending appeal.  (Doc. 43.)  On March 24, 2008,

the magistrate judge granted the stay of Baca's sentence as to
his community service, payment of the statutory assessment, and
probation.  (Doc. 48.)  The magistrate judge denied staying the
post-conviction booking order.  (Doc. 48.)  On September 1, 2008,
Baca moved to stay his sentence and order to present himself for
post-conviction booking.  (Doc. 85.)  On September 9, 2008, the
district court granted Baca's motion to stay the magistrate's
order to present himself for post-conviction booking pending
appeal.  (Doc. 88.)

Baca filed a notice of appeal on March 20, 2008, and his
opening brief on September 9, 2008.  The Government filed
opposition on January 13, 2009, and Baca replied on February 6,
2009.  Oral argument was heard March 9, 2009, and the appeal was
submitted for decision.

### III.  STATEMENT OF FACTS

Baca is part Mescalero Apache and part Pueblo Indian.  (Doc.
76 at 13.)  Baca is a Native American spiritual leader who earned
a master's degree in American Indian Studies from the University
of California, Los Angeles with his thesis: "Song, Dances, and
Tribal Traditions of the Tuolumne Band of California Miwok."
(Doc. 76 at 17.)  Baca seeks to preserve the cultural traditions,
ceremonies, music and dances of the California Miwok tribe.
(Doc. 76 at 24-27.)  He shares the Miwok tradition through
lectures, performances, videos, recordings, manuscripts and
photography.  (*Id.*)  The California Miwok are largely based on
oral tradition and do not record their traditions in writing or
on film.  (Doc. 70 at 65.)

**3**

In June 2002, Baca attended the Yosemite Big Time, which is held in the Indian Cultural Village within Yosemite National Park ("YNP"). (Doc. 76 at 31, Doc. 70 at 14.) The Yosemite Big Time ("Big Time") is similar to a powwow; it is a social gathering where the Indian community comes together and performs various ceremonies and dances. (Doc. 70 at 13-14.) Local and native vendors are also invited to set up a table and sell their arts and crafts. (Doc. 70 at 67, 109.) The Big Time coordinator, a park employee who co-ordinates the event on her or his own time, determines what items vendors may or may not sell at Big Time. (Doc. 70 at 109-110.) Native vendors are permitted to sell their items without a permit and without paying a fee, however, they are encouraged to donate a fee if they can afford to do so. (Doc. 70 at 110.) Baca was not a vendor at this event.

With the exception of certain ceremonies, Big Time is generally open to the public. (Doc. 70 at 92, Doc. 75 at 65.) While attending the June 2002 Big Time, Baca along with Richard Robinson, filmed dances, songs, and interviewed native artisans. (Doc. 76 at 27, 30.) Richard Robinson is a photography teacher who also studies Native American culture; he aided Baca in recording and editing the film footage at issue. (Doc. 75 at 8-10, 30.) Baca obtained permission from the persons he filmed prior to putting them on camera. (Doc. 76 at 28-29.) Baca testified that his intent was to preserve and educate others on Miwok tradition and culture. (Doc. 76 at 26-28.)

Baca edited this footage, with Richard Robinson, into "Native America - Lorenzo Presents Big Time at Yosemite, 2003, Lorenzo" ("video"). (Doc. 70 at 41.) During certain portions of

**4**

the film, a roundhouse and sweat lodge located behind the YNP museum appear in the video. (Doc. 70 at 43-44.) These scenes show the outside and inside of the roundhouse while Baca narrates its purpose. (Doc. 72 at 110, 112.) The roundhouse and sweat lodge sit in an enclosed area, known as the Ahwahnee Indian Village, behind the YNP museum. (Doc. 70 at 28, Doc. 73 at 76, Doc. 75 at 29, 30.)

The entrance to the roundhouse is blocked by a bar and a sign which reads:

> This is the ceremonial roundhouse or "hangie", the center of village religious activity. Because this house is being used in the old way, we ask that you stay behind the barrier and off the roof. Thank You.

Government Exhibit 7.

The entrance to the sweat house is also blocked and has a sign which reads:

> This is the sweat house, used for cleansing and religious purposes. Because of the usage of this house in the old ways, we ask that you stay behind the barrier. Thank You.

(Doc. 70 at 35, 22, Government's Exhibit 9.) Written or oral permission to enter the roundhouse may be given by the Miwok tribal council or park staff who conduct tours. (Doc. 70 at 27.) Filming within the roundhouse is not permitted by the tribal council as it is contrary to their traditional beliefs and deemed "taboo." (Doc. 70 at 49, 79.)

The video appears to show Baca going underneath the barrier and walking into the roundhouse. (Doc. 70 at 48, Doc. 72 at 110.) After the video was released, an investigation was commenced by park authorities. (Doc. 72 at 109-110.) When confronted by Park Ranger Todd Bruno, Baca stated that he had

permission to enter the roundhouse, but did not have permission to shoot the video in the roundhouse. (Doc. 72 at 118.) However, after further investigation, Bruno discovered that neither the staff nor the tribal council had given Baca permission to enter the roundhouse or film inside of it. (Doc. 72 at 120, Doc. 70 at 79, Doc. 73 at 70.) At trial, no staff or tribal council member testified that Baca had been granted permission to enter the roundhouse.[1] Baca testified that he saw the barrier, but viewed the barrier as a "suggestion" rather than as a restriction. (Doc. 76 at 34.) Baca does not dispute that he entered and filmed in the roundhouse, however, he maintains that he believed he had permission to enter because he had permission to enter in the past.[2] (Doc. 76 at 21, 33.)

The roundhouse, built in 1974, is a spiritual and cultural center for the California Miwok and Paiute people. (Doc. 73 at 71, Doc. 75 at 74, Doc. 82 at 12.) Jeannette Simons is YNP's historic preservation officer and Native American liaison, she holds a master's degree in anthropology. (Doc. 82 at 12.) Simons testified that the roundhouse was a resource with "traditional and cultural significance to American Indian tribes." (Doc. 76 at 8.) The roundhouse is distinguishable from the cedar bark houses, which are small "traditional" structures located throughout the Indian Village. (Doc. 76 at 6.) The

---

[1] One member could not recall if he had granted Baca permission to enter the roundhouse.

[2] Baca testified: "[R]egarding permission, I received permission from Brown Tad, Craig Bates, and Julia in the past." (Doc. 76 at 33.)

6

cedar bark houses do not have barriers across the doors, as the roundhouse does, because "they don't hold the cultural or religious significance that the roundhouse" does. (*Id.*) Simons also testified as to her opinion of what constitutes a cultural resource:

> A cultural resource would be a representation of places, materials, building, structures, artifacts that are less than 50 years old that have cultural significance.

(Doc. 82 at 17.)

Generally, permits are required to film commercial productions within YNP. (Doc. 73 at 19.) Permits are granted after YNP considers the impact on the resource during the filming. (Doc. 73 at 19, 23, 43.) Park ranger and film coordinator, Susan Schultz Clark ("Clark"), testified that certain permit exceptions exist, including exceptions for visitors coming into the park and filming YNP scenery with a hand-held or personal camera. (Doc. 73 at 31.) Clark also testified that permits are not required for artists who take photos and use the photos for their art portfolios. (*Id.*) Permits are also not required when visitors take "beauty shots" of the park with their hand-held camera, go home, and then decide to sell the footage at a later date. (Doc. 73 at 32.)

Four months after his filming, during October 2003, Baca sold ten copies of his video to the YNP museum gift shop, located in YNP. (Doc. 70 at 133-134.) Baca also sold two videos to Herb Puffer, owner of Pacific Western Traders, a Native American art and educational supply store located in Folsom, California. (Doc. 72 at 84, 90.) To sell items within YNP, a person is

7

required to obtain a permit from the park service.  (Doc. 73 at 96.)  Baca did not have a permit to sell items within the national park.  (Doc. 76 at 41.)  However, prior to the sale of the ten videos to the YNP museum gift shop, Baca has sold handmade jewelry to the museum gift shop, and was never required to have a permit.  (Doc. 76 at 43-44.)  The Yosemite Association ("YA") decides what items to sell in the museum gift shop and generally does not require its vendors to have a permit.  (Doc. 73 at 96.)  YA has an agreement with YNP's park service to allow outside vendors to do business with YA without a permit because YA holds the requisite permit to sell items within YNP.  (*Id.*)

## IV.   JURISDICTION

A district court has jurisdiction over an appeal from a conviction before a magistrate judge pursuant to 18 U.S.C. § 3402.

## V.   STANDARDS OF REVIEW

A district court reviews a denial of a recusal motion for abuse of discretion.  *Pesnell v. Arsenault*, 543 F.3d 1038, 1043 (9th Cir. 2008) (citing *Jorgensen v. Cassiday*, 320 F.3d 906, 911 (9th Cir. 2003)); *Mangini v. United States*, 314 F.3d 1158, 1161 (9th Cir. 2003).

A claim of insufficient evidence is reviewed de novo. *United States v. Hernandez-Orellana*, 539 F.3d 994, 1002 (9th Cir. 2008); *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002).  A court must determine "whether, after reviewing the

**8**

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[3]

Otherwise, a district court reviews a magistrate's factual findings for clear error and legal conclusions de novo. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986). Mixed questions of law and fact are subject to de novo review; however, the factual findings that underlie the application of the law are reviewed for clear error. *Id.; United States v. Prieto-Villa*, 910 F.2d 601, 604 (9th Cir. 1990). Additionally, a "reviewing court must respect the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996).

## VI. DISCUSSION

### A. Motion to Disqualify Magistrate Judge

Appellant argues that the magistrate judge abused his discretion in denying the recusal motion. (Doc. 86 at 13.) *See Pesnell*, 543 F.3d at 1043 (denial of recusal reviewed for abuse

---

[3] An "appellant waives his challenge to the sufficiency of the evidence by failing to move for judgment of acquittal at the close of the government's case or at the close of trial. . . ." *United States v. Acrrhdale*, 229 F.3d 861, 867 (9th Cir. 2000). Here, Appellant moved for judgment of acquittal on August 17, 2007, at the close of the government's case, which the court denied. (Doc. 73 at 89, 93.) Appellant has not waived his challenge to the sufficiency of the evidence.

9

of discretion).

On November 14, 2007, Appellant moved to disqualify the magistrate judge. (Doc. 75 at 4.) The motion was based on a newspaper article in the Fresno Bee, a newspaper of general circulation, observed by Appellant on the internet, about Magistrate Judge Wunderlich's role and caseload at the Yosemite courthouse. The article includes an interview with and a photograph of the Magistrate Judge putting on his robe in his chambers. To the right of the Judge is a hangman's noose hanging from a coat rack. A second photo in the article depicts the hangman's noose in a close-up shot, with the magistrate judge's silhouette in the background. The article does not discuss the hangman's noose.

The article was released a few days before Appellant's bench trial began. Appellant found the article and was offended by the presence of the hangman's noose. (Doc. 75 at 3.) Appellant moved to recuse based on what the "hangman's noose represents . . . is threatening, intimidating, offensive, and [that] he [felt] prejudiced and that he would not be able to receive a fair trial." (Doc. 75 at 3-4.)

In addressing recusal, the Judge admitted that the hangman's noose appeared in the photo and that it was hanging on a coatrack in plain view in his chambers. (Doc. 75 at 5.) The Judge explained that the noose was given to him as "sort of a memento" and as a "joke" by his former colleagues at the District Attorney's office when he left in 1985 to take the state bench. (*Id.*) The noose came with a note that said "don't forget where you came from." (*Id.*) The Judge further explained that the

noose has "nothing to do with my personal philosophy" and that he is "not known as a 'hanging judge.'" (*Id.*)  The Judge denied the recusal motion, finding he could do a "fair job of presiding over this trial." (*Id.*)  He did not discuss or analyze any adverse appearance created by the presence and his authorized public display in the newspaper of his hangman's noose.

Section 28 U.S.C.A. § 455(a) reads:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

The purpose of § 455 is "to avoid even the appearance of partiality." *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (quoting *Liljeberg v. Health Serv. Acquisition Corp.*, 796 F.2d 796, 802 (5th Cir. 1986)).  Section 455 "does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." *Id.*

The Ninth Circuit test is:

[W]hether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.

*United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008) (citing *Clemens v. U.S. Dist. Court for the Cent. Dist. of Cal.*, 428 F.3d 1175, 1178 (9th Cir. 2005)).  The "reasonable person" is a "well-informed, thoughtful observer[,]" not someone who is "hypersensitive or unduly suspicious." *Id.* (internal quotations omitted).  Section 455(a) disqualification is fact-driven and "may turn on subtleties in the particular case." *Id.*

[T]he analysis of a particular section 455(a) claim must be guided, not by comparison to similar situations

> addressed by prior jurisprudence, but rather by an
> independent examination of the unique facts and
> circumstances of the particular claim at issue.

*Id.* (quoting *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999)). Something other than "rulings, opinions formed or statements made by the judge during the course of trial" is required. *Id.* (citing *Liteky v. United States*, 510 U.S. 540, 554-56 (1994)). The judge's conduct during the course of trial should not form the sole basis for recusal. *Id.*

Appellant argues recusal was required because a reasonable person would question the impartiality of any judge who displays in his chambers a hangman's noose, "a known symbol of racial hatred," in a criminal proceeding involving a Native American, i.e, "a person of color." (Doc. 86 at 17-18.) The Government rejoins that no reasonable person would question Magistrate Judge Wunderlich's impartiality "based on his possession in his [judicial] office of a memento by his former colleagues at the D.A.'s office." (Doc. 95 at 5.) The Government focuses on the Judge's explanation for having and keeping the hangman's noose in his judicial chambers, and not on the appearance and effect of possession and authorized public display of the Judge's hangman's noose in the newspaper just prior to the trial. (Doc. 95 at 5-6.)

It is undisputed that the judge knew that he kept the hangman's noose in plain view in his chambers, and that he authorized its photograph for public dissemination in a newspaper article about him. He was present and is depicted in both photographs of the noose. Appellant focuses on the symbolism of and message conveyed by a hangman's noose in a racial context;

12

i.e, that the noose is "a known symbol of racial hatred." (Doc. 86 at 17.) Appellant, as a Native American defendant, asserted that the trial judge's possession and display of such a symbol caused Appellant, and any reasonable person, to question whether a person of color could receive a fair bench trial. The Government admits that in "some contexts a noose might indeed represent a symbol of racial hatred and oppression." (Doc. 95 at 6.) However, the Government argues that the context surrounding the noose in the magistrate judge's chambers would not "make a reasonable person believe it was being displayed as a symbol of racial hatred or oppression," without offering any legitimate purpose served by a hangman's noose in a judge's public office.[4]

The legal issue presented is whether the Magistrate Judge's conduct, in possessing and displaying a hangman's noose in his judicial chambers and in authorizing a newspaper to publish, just prior to a bench trial, photographs of him standing next to the noose, is sufficient to create an appearance to a reasonable person of a lack of impartiality. A hangman's noose is a symbol of extrajudicial murder and racial hatred. It also suggests a "hanging judge," (i.e., a judge who is inclined to side with the prosecution). In response to the recusal motion, the magistrate judge was oblivious to the negative messages of injustice and bigotry that the hangman's noose communicate. Rather, he viewed

---

[4] Recently, in the 2009 session, Assembly Member Wilmer Amina Carter proposed California Assembly Bill No. 412, which would make it a crime to display or use a hangman's noose in a threatening manner. *See* Assem. B. 412, 2009-2010 Reg. Sess. (Cal. 2009) (to amend Cal. Penal Code § 11411 relating to hate crimes).

his possession and display of the noose as a "joke," and not reflective of his personal subjective beliefs. Although the source of the gift of the noose was his former prosecutor colleagues, that the magistrate judge displayed the hangman's noose in his judicial office, adjoining the single courtroom in the YNP courthouse where trials were held, and permitted it to be twice photographed for public dissemination in a newspaper during trial, demonstrates an inexplicable lack of judgment or sensitivity to the message a hangman's noose sends.

A U.S. Magistrate Judge's duty is to avoid conduct which creates an appearance of circumstances that call into question the judge's impartiality. *See Liteky*, 510 U.S. at 548 (". . . what matters is not the reality of bias or prejudice but its appearance"); Model Code of Judicial Conduct Preamble (2007) (this duty includes to engage in conduct that ensures the greatest possible public confidence in the judge's impartiality).[5] The standard also incorporates the ABA Code of Conduct for United States Judges: "to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Model Code of Judicial Conduct R. 1.2 (2007).

The test is whether the appearance of the Magistrate Judge's

---

[5] **The Preamble to the Model Code of Judicial Conduct reads: "Judges should maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives. They should aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence."**

impartiality might reasonably be questioned by his possession, display, and authorized public dissemination, during the criminal trial of a Native American defendant, of photographs of a hangman's noose maintained in his judicial chambers.  The test centers on whether a reasonable person with knowledge of all the facts would conclude the Judge's impartiality might reasonably be questioned.  The "reasonable person" is a "well-informed, thoughtful observer[,] not someone who is "hypersensitive or unduly suspicious."  *Holland*, 519 F.3d at 913.  Here, Appellant observed, in a newspaper article about the magistrate judge and the Yosemite court's caseload, two photos of the magistrate judge displaying a hangman's noose in his court chambers, in the same building that housed the courtroom where Appellant was being tried.  Appellant testified that, to him, at that time, "what the hangman's noose represents is threatening, intimidating, offensive," that he felt prejudiced, and that "he would not be able to receive a fair trial."  Is this reasonable, not hypersensitive or unduly suspicious?

Despite the magistrate judge's denial that the noose had anything "to do with [his] personal philosophy" and that he is "not known as a 'hanging judge,'" a hangman's noose is the antithesis of the dignity of judicial office.  A hangman's noose is the instrument by which death by hanging is affected.  It has no other purpose.  A reasonable observer could reasonably question the magistrate judge's impartiality based on this course of conduct, without being paranoid or unreasonably suspicious.  The magistrate judge, who was a former prosecutor, albeit more than twenty years prior, valued the hangman's noose because it

**15**

was a memento from former prosecutor colleagues, originally conveyed with their sentiment, "don't forget where you came from," i.e., do not forget you were a prosecutor. He characterized the noose as a "joke," ignoring any other connotation. He disclaimed that it could be interpreted to suggest that he is a hanging judge (i.e., biased or prosecution-oriented). However, the totality of circumstances reasonably call into question to any reasonable observer whether the judge held beliefs that favored the prosecution and reflected racial intolerance and injustice.

No finding need be or is made on the objective fact of actual impartiality, as that is not the test. The challenge is not that the magistrate judge was actually biased against Appellant or partial to the prosecution. Under the Supreme Court and Ninth Circuit jurisprudence, the test for appearance of lack of impartiality is met based on the unique circumstances of this case. Although the presence of the newspaper reporter in the magistrate judge's chambers just before Appellant's trial was fortuitous, the magistrate judge's authorized publication of the photographs of him with his hangman's noose in effect promoted the noose, which created an unacceptable <u>appearance</u> to Appellant and to a reasonably objective observer that the judge was partial to prosecutors and possessed in his court chambers a universally recognized symbol of racial intolerance, unfair punishment, and injustice, which he did not repudiate or disclaim,

notwithstanding any contrary beliefs he actually held.[6]  The
magistrate judge abused his discretion in failing to recognize
and correctly analyze the effect on Appellant his conduct
created, and by failing to recuse himself under the unique
convergence of circumstances in this case.

     For all these reasons, Appellant's recusal motion is
GRANTED.

     Appellant seeks reversal of his convictions and sentence.
(Doc. 86 at 20.)  Section 455 does not "prescribe nor prohibits
any particular remedy for a violation of that duty."  *Liljeberg*,
486 U.S. at 862.

     Under the totality of circumstances, Appellant's convictions
and punishment cannot stand.  The public's confidence in the
impartiality, fairness, and sound judgment of the judiciary
deserves the highest respect and must be maintained.  Appellant
was and is entitled to be tried by a judge unencumbered by the
appearance of partiality, i.e., a judge who does not possess and

---

     [6]     In *Clemens*, 428 F.3d at 1178, the Ninth Circuit adopted
a list of "various matters not ordinarily sufficient to require a
§ 455(a) recusal" from the Tenth Circuit.  *See Nichols v. Alley*,
71 F.3d 347, 351 (10th Cir. 1995).  The list includes a
"reporter['s] personal opinions or characterizations appearing in
the media, media notoriety, and reports in the media purporting
to be factual . . . but which are in fact false . . . ."  *Id.*
     Here, the newspaper article depicts Magistrate Judge
Wunderlich in a photograph that emphasizes the noose by
displaying it in the forefront while the magistrate judge's
silhouette is seen through the noose in the background.  Although
some degree of editorial license may have been taken by the
reporter with the photography, reflecting the reporter's personal
opinions, the presence of the noose in Judge Wunderlich's
chambers at the time of the photographs and trial is a matter of
undisputed fact.  *Clemens* is distinguishable.

publically display, just before trial, for public dissemination,
a hangman's noose that portrays injustice, bigotry, and
unfairness.  In an abundance of caution, the merits of the
convictions are analyzed below.

### B. Sufficiency of Evidence to Support Violation of 36 C.F.R. § 5.3

Baca appeals his conviction under 36 C.F.R. § 5.3,[7] arguing
his conviction was unsupported by the evidence presented at
trial.  (Doc. 86 at 20.)  Appellant argues that § 5.3 does not
cover the exact conduct he engaged in, namely selling his video
to the Yosemite National Park museum.

Appellant's claim of insufficient evidence is reviewed de
novo.  *Hernandez-Orellana*, 539 F.3d at 1002; *Carranza*, 289 F.3d
at 641.  A court must determine "whether, after reviewing the
evidence in the light most favorable to the prosecution, any
rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.

Section 5.3 provides:

> Engaging in or soliciting any business <u>in park areas</u>,
> except in accordance with the provisions of a permit,
> contract, or other written agreement with the United

---

[7]  **Appellant's opening brief refers to 36 C.F.R.
§ 2.1(a)(5), however, this appears to be a typographical error.
Appellant states: "Mr. Baca was convicted of violating 36 C.F.R.
[§] 2.1(a)(5) for 'engaging or soliciting business' in Yosemite
National Park without a permit."  (Doc. 86 at 20.)  Section
2.1(a)(5) prohibits trespassing on a cultural resource, whereas
§ 5.3 prohibits "engaging in or soliciting business" within a
national park.  The Government's reply brief ("Appellee Brief")
refers to 36 C.F.R. § 5.5, which also appears to be a
typographical error as the Government quotes language from § 5.3.
(Doc. 95 at 7.)**

18

> States, except as such may be specifically authorized
> under special regulations applicable to a park area, is
> prohibited.

36 C.F.R. § 5.3 (emphasis added).

The statute "governs business operations <u>within</u> all of the national parks." *Lesoeur v. United States*, 21 F.3d 965, 968 (9th Cir. 1994) (determining that an Indian tribe engaged in whitewater rafting tours was exempt from § 5.3's permit requirement under 36 C.F.R. § 7.4(b)) (emphasis added). The seminal inquiry turns on whether Appellant engaged in business within YNP,[8] as the government has no evidence Appellant solicited any filming business within YNP.

Appellant argues that his transaction with YA, in selling the video to the museum, should be the sole basis for a § 5.3 violation as it was the only business conducted within YNP. (Doc. 86 at 20-23.) Appellant maintains that his transaction with YA does not constitute a § 5.3 violation because he is not required to have a permit to engage in business with the museum and even the park service allows those doing such business to rely on the gift shop operator's permit. (*Id.*) The Government argues that this transaction (sale of the videos to YNP) was not the basis for his conviction and should therefore not be considered by the court. (Doc. 95 at 8.) The "actual finding of the magistrate judge [was] that [Baca] was engaging in a business

---

[8] Neither party provided relevant case law to support his or its position. Case law applying § 5.3 is limited to a handful of cases, only one Ninth Circuit case, *Lesoeur v. United States*, 21 F.3d 965 (9th Cir. 1994), considered § 5.3 in deciding whether 36 C.F.R. § 7.4(b) exempted a Tribe's river tours from § 5.3 permit requirements.

19

by entering the park to make a movie that he intended to sell."
(Doc. 95 at 8.)  The Government contends that "[t]here was
sufficient evidence to support this conviction."  (*Id.*)  However,
by the government's concession, this finding cannot relate to the
ten videos sold to the museum gift shop.

The magistrate judge, in an oral decision in open court,[9]
found that Baca "went in[to the cultural resource] . . . to
engage in a business:"

> You [Baca] went in there to engage in a business and so
> I'm finding you guilty of Count 3 as well.  Not because
> you solicited business from Ms. Brocchini down at the
> museum but because on Big Time 2002 you were there to
> conduct a business.  <u>You were there to make a film that
> you intended to sell</u>.
>
> <u>Your intent is made obvious by your earlier conduct
> with the Tuolumne Band, all of which is in evidence in
> this matter and which your subsequent conduct in
> selling this to Mr. Puffer and to the museum</u>.
>
> You entered not for educational reasons but for
> business reasons into the –- into a cultural resource.
> You made a movie that you intended to sell.  So I
> believe you were engaging in a business in a park area
> without a permit . . . .

(Doc. 76 at 106-107.) (emphasis added).  The magistrate judge
also found Baca incredible and rejected all of his testimony.
This oral statement of decision ignores Appellant's long and
indisputable history as a Miwok historian and Indian spiritual
leader, who has for over fifteen years, acted to preserve,
record, film, depict, and report on Native American culture and
history.  There is no reasonable explanation for such an unfair

---

[9]  **Federal Rule of Criminal Procedure 23(c) requires "[i]f a
party requests before the finding of guilty or not guilty, the
court must state its specific findings of fact in open court or
in a written decision or opinion."  The record does not reflect
if such a request was made by defense counsel.**

interpretation of the evidence.  The evidence is uncontradicted that Baca has been deeply involved in Native American education, including during the time of this incident.  The record contains scant admissible evidence of Baca's pre-existing or contemporaneous intent to engage in the filming business for profit.

In *United States v. Carter*, 339 F. Supp. 1394, 1395 (D. Ariz. 1972), the defendant rented boats at his business location outside of the Glen Canyon National Recreation Area ("Glen Canyon").  With the rental of a boat, the defendant included the service of launching the boat at the Wahweap Landing launching site, one of the only launching sites available to the public. *Id.*  The defendant also provided guided fishing and sightseeing tours on the lake within Glen Canyon.  *Id.*  The defendant argued that he was not subject to § 5.3 because "he owns no place of business within Glen Canyon" and he "merely launches boats from the [public] launch site."  *Id.* at 1399.  In deciding whether the defendant's conduct satisfied § 5.3, the court stated:

> It is important to note that in order for the defendant to perform any of the varieties of service he makes available to the public, he must always carry his boats over government-owned recreation area land to the . . . launching site at the edge of Lake Powell . . . . [T]he fact [the] defendant must enter into the recreation area and use the facilities provided by the Government as a prerequisite to fulfilling his obligation to his customers (whether the activity involved is merely launching a rented boat on Lake Powell for the customer's personal use <u>or</u> the launching of a guide boat to be piloted by defendant's agents) is sufficient to constitute engaging in business within the recreation area within the meaning of 36 C.F.R. § 5.3.

*Id.* at 1397 (internal citations omitted) (emphasis added).

The court found that the defendant's activities, which necessarily used public lands to provide boat rental and

21

launching services, were "sufficient to constitute engaging in business within the recreation area within the meaning of . . . § 5.3." *Id.*

Similar activity was at issue in *Free Enterprise Canoe Renters Association of Missouri v. Watt* ("*Free Enterprise*"), 711 F.2d 852, 854-55 (8th Cir. 1983). There, the Eighth Circuit considered whether a subsequent regulation attempting to regulate canoe boat retrievals from the national park's river was valid. The court recognized that the subsequent regulation was promulgated in response to its district court decision in *United States v. Williams*, No. S75-29 Cr (E.D. Mo. Dec. 22, 1975). Explaining the district court's decision, that a person doing business outside of the national park was not in violation of § 5.3, *Free Enterprise* considered the facts in *Williams*:

> In 1975, the Service charged Irby Williams . . . with violating 36 C.F.R. § 5.3 (1982). The Park Service alleged that in retrieving rented canoes from a sand bar next to a public road running through the [Ozark National Scenic Riverways ("ONSR")] without a permit. The District Court found that Williams's place of business was outside the ONSR boundaries, that he made no charge for retrieving the canoes, and that retrieval took place on a public road. Accordingly the District Court held that Williams was not guilty of doing business within ONSR in violation of the regulation.

*Id.* at 855. *Free Enterprise* agreed with the rationale in *Williams*, which considered factors similar to those in *Carter*: business location, nature of the boat retrieval or launching service, and the location of the service. *Id.*; *Carter*, 339 F. Supp. at 1397.

In this case, Baca was convicted of engaging in the business of filming and selling his video, "Native America - Lorenzo Presents Big Time at Yosemite, 2003, Lorenzo" in YNP and at

Folsom.  The magistrate judge concluded that Baca entered YNP "to make a film that [he] intend[ed] to sell."  (Doc. 76 at 107.)

Unlike the defendants in *Carter* and *Williams*, Baca does not own or operate a business that offers filming or photography services within YNP or elsewhere.  There is no other evidence that Baca is in the photography business.  Baca is employed as a spiritual leader, and he describes himself as an educator, scholar, and researcher of Native American culture.  (Doc. 76 at 23, 27.)  Baca testified that he endeavors to preserve Native American culture through photography, video, and manuscripts, which he has been doing his whole life.  (Doc. 76 at 25.)  There is no evidence that Baca operated a business to make documentary films for profit.  There is no evidence he has a photography studio, he does not advertise filming services, no evidence was offered establishing how much income, if any, he derived from photography in any year, or whether he ever profited from filming.  Baca testified that his intent in selling the twelve videos  was not to profit from the sale of the films, rather, he only sought to recoup costs of making the film.  (Doc. 76 at 65-66.)  Baca routinely sells his handmade jewelry to the YNP museum gift shop, which is evidence that Baca was in the business of making and selling Native American art and artifacts.  None of his art or artifacts, however, were described as photographs or films taken by Baca.

The magistrate judge referred to Baca's sale of two videos to Mr. Puffer, owner and operator Pacific Western Traders ("PWT"), as evidence that Baca violated § 5.3.  (Doc. 76 at 107.)

23

PWT is a Native American arts and educational supplies store located in the Folsom area. (Doc. 72 at 87.) The video sales to Mr. Puffer did not occur within YNP and no videos were re-sold within YNP, as required by § 5.3. This conclusion is supported by *Executive Boat & Yacht Brokerage v. Aramark Sports & Entm't Serv., Inc.*, No. 2:07CV69DAK, 2008 WL 4279646 at *3 (D. Utah Sept. 12, 2008), which determined that boat sale transactions within a national park without a permit violated § 5.3. *See also United States v. Armstrong*, 186 F.3d 1055, 1059 (8th Cir. 1999) (finding a tour boat operation within a national park without a permit violated § 5.3); *United States v. Duffy*, 479 F.2d 1038, 1039 (2d Cir. 1973) (finding commercial fishing within national park violated § 5.3).

Baca argues his sale of the ten videos, through the YA, to the YNP museum gift shop, is no different from his previous sales of handmade jewelry to the YA for which he has never been prosecuted. (Doc. 86 at 21-22.) YA's sales station coordinator, Nicole Brocchini, a park ranger's relative, testified that no person selling his or her merchandise to the YA is required to have a permit because YA's agreement with the national park service allows YA to be the sole permit holder. (Doc. 73 at 96.) The ten video sales to the gift shop cannot form the basis for conviction under § 5.3 as the magistrate judge correctly determined.

The magistrate judge concluded that Baca intended to enter the national park to make a film which he intended to sell. As the defendant in *Carter*, Baca's photography took place within the

**24**

national park and Baca used national park resources, i.e., filming Big Time and the Indian Village, to complete his video. However, unlike *Carter*, where the defendant rented the canoe, offered to launch the canoe, and then traversed the national park to fulfill his canoing obligations for which he was paid, Baca did not have a prior agreement to film or document Big Time or the roundhouse for profit.  The evidence suggests that Baca undertook this project for the purpose of documenting the dances and events at Big Time without any undertaking or obligation to anyone else to produce a film for sale.  Even though the filming of the video was conducted on YNP's premises, there is no evidence that Baca was committed to sell the video once his project was completed.

Moreover, YNP's film permit coordinator testified that a visitor with a hand-held camera, who takes "beauty shots" of the park, "and then decides later that they want to sell the footage" is under no obligation to then seek a permit to sell the footage. (Doc. 73 at 32.)  Baca's conduct here is similar to a visitor's conduct in YNP, who later decides that the footage is good enough to sell.


### 1.   Admission of 404(b) Character Evidence

The government offered evidence of a 1992 civil case in which Baca was accused of filming, without permission, Tuolumne Indians performing a ceremonial dance, who were under the age of majority.  This evidence was heavily relied on and characterized by the magistrate judge as providing conclusive evidence for a

finding of intent to support a conviction for violating § 5.3.
The 1992 civil case was settled without a trial.  The offer of
proof, made on the second day of trial by the government, was
that in 1992 the Tuolumne Band of Miwok Indians sued Baca for
filming traditional dances at the Sonora Museum in Sonora,
California.  In 2001, Baca copyrighted the video footage from the
material and released it for sale in several areas including on
the internet, some other museums, and state parks.  The filming
was without permission of the tribe or the dancers themselves.
The 13-year-old prior act was offered to show:

>        Mr. Baca's intent to make commercial use of this video
>        footage; that it is similar; that the dancers were
>        performing traditional dances, songs, music, and
>        narrative and in a public place; that the recordings,
>        though Mr. Baca may argue that they were made for
>        educational purposes, were a short time later released
>        for commercial use; and that these videos were released
>        for sale in the $20-$30 range depending on whether it
>        was the audio or video tape itself.

(Doc. 72 at 135.)

        The government further offered the prior images and the acts
to show intent for commercial purposes to support an absence of
accident, absence of motive for educational purposes and, as
consistent with the government's legal theory, that one of the
violations to be proved was for commercial filming.  (Doc. 72 at
135.)

        In the Ninth Circuit, evidence may be admitted under 404(b)
if:

>        (1) the evidence tends to prove a material point; (2)
>        the other act is not too remote in time; (3) the
>        evidence is sufficient to support a finding that
>        defendant committed the other act; and (4) (in certain
>        cases) the act is similar to the offense charged.

26

*United States v. Cherer*, 513 F.3d 1150, 1157 (citing *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002)(quoting *United States v. Chea*, 231 F.3d 531, 534 (9th Cir. 2000))).  If evidence satisfies Rule 404(b), "the court must then decide whether the probative value is substantially outweighed by the prejudicial impact under Rule 403."  *Romero*, 282 F.3d at 688.

Rule 404(b) is a rule of inclusion - not exclusion - which references at least three categories of "other acts" encompassing the inner workings of the mind; motive, intent, and knowledge.  Once it has been established that the evidence offered serves one of these purposes . . . the "only" conditions justifying the exclusion of the evidence are those described in Rule 403: unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, and needless presentation of cumulative evidence.  *United States v. Curtain*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc).

Here, the magistrate judge found that the 1992 incident amounted to "prior bad acts."  (Doc. 72 at 136.)  The magistrate judge stated that the "question is when did the defendant engage in the acts and do they demonstrate the requisite intent, knowledge, and so forth under 404(b)."  (Doc. 72 at 136-37.)  Moreover, the magistrate judge determined that "the California cases talk abut whether they fit like a hand in a glove, and these do."

In ruling on the 404(b) motion the magistrate judge reasoned:

It's —-filming, not just any filming, filming Native
Americans not doing just anything but dancing and
singing and then reducing that to a tape that is
eventually sold.  And obviously the lawsuit
demonstrates that that was done without the Tuolumne
band.  This just happens to —- if you just take the
name Tuolumne and substitute it for Southern Sierra
Miwoks of Mariposa County you have the same lawsuit
right here.

(Doc. 72 at 137.)  The magistrate judge concluded that "these
[acts] are so identical as to be exactly fitting within the
meaning of 404(b)."  (*Id.*)

However, the evidence of a single incident in a 13-year
period before the 2005 YNP incident, in which only one video had
been produced which Baca sold, was remote in time.

The magistrate judge ignored and did not accept, despite
undisputed evidence to the contrary, the testimony of Baca that
he was a long-time student of Native American culture, a
spiritual leader, engaged in educational activities to preserve
and advance Native American culture and that he had devoted a
substantial part of his life to doing so.  Although the
magistrate judge found Baca incredible, and rejected his
testimony, there was substantial undisputed evidence offered by
Baca about his not-for-profit educational and cultural activities
carried out throughout his adult life to support the advancement
and preservation of Native American history, custom, and culture.

The evidence of Baca's long established frequent prior
activities in and around Indian reservations and recording and
reporting on the exhibition and demonstration of Indian cultural
artifacts, ceremonies, and other customs, did not constitute
corroborating evidence of commercial activity by Baca.

28

In moving to exclude the 404(b) character evidence, Baca did not attack the admissibility of the prior act on the ground that it did not prove a material point, i.e., intent. The magistrate judge made no finding of whether the evidence of the prior act was sufficient to find Baca committed the prior act, as that prior civil case was settled. No evidence was offered that Baca made any admission he was engaged in the commercial filming business thirteen years earlier. Finally, the prior act involved the unauthorized filming of minor Native American dancers, whereas in this case permission was obtained from all persons appearing in the video.

Despite the prior act's remoteness in time, the magistrate judge found that the prior act was identical to the offense charged, without any Rule 403 analysis of the prejudicial or confusing effect of the prior act evidence, as required by the Federal Rules of Evidence and Ninth Circuit precedent. *See* Fed. R. Evid. 403; *Romero*, 282 F.3d at 688.

### 2. Conclusion Regarding Sufficiency of the Evidence for Conviction of 36 C.F.R.§ 5.3

The Magistrate Judge concluded at RT 6-104:9-14, that Baca entered YNP "not for educational reasons but for business reasons into the –- into a cultural resource." He found that Baca made a movie that he intended to sell. "So I believe you were engaging in business in a park area without a permit and I believe you were [sic] traversed a cultural resource in violation of 36 C.F.R. 2.1(a)(5)."

The Magistrate Judge did not analyze whether Baca had any prior agreement to sell the two videos at Folsom or YNP; whether he offered or advertised any Big Time videos to anyone else; whether or not Baca ever conducted a photography business; whether he sold any other films except on one occasion thirteen years prior to the incident; whether he ever advertised his photography services; whether Baca ever designated himself as a commercial photographer or as in the photography business; or whether he ever used a business name or style to describe that he conducted or engaged in a photography business for profit.  No written or oral evidence was offered that Baca had ever advertised, promoted, offered for sale, or engaged in any business activities to sell films of Native American dances and cultural activities.

The record evidence is marginal to support a finding beyond a reasonable doubt that Baca violated 36 C.F.R. § 5.3, engaging in or soliciting a filming business in a national park.  Even affording deference to the credibility findings and drawing all inferences from the evidence in favor of the judgments of conviction, whether the evidence was sufficient to prove § 5.3 violation beyond a reasonable doubt is open to question.  This count need not be resolved as the entire case must be retried.

> C.    Sufficiency of Evidence to Support Violation of 36 C.F.R. § 2.1(a)(5)

At oral argument, Appellant maintained that there was insufficient evidence to convict him for violating 36 C.F.R.

§ 2.1(a)(5), entering a cultural resource, because the roundhouse is not a "cultural resource" protected by the statute.

Section § 2.1(a)(5) provides:

(a) Except as otherwise provided ... the following is prohibited:

(5) Walking on, climbing, entering, ascending, descending, or traversing an archeological or cultural resource, monument, or statue, except in designated areas and under conditions established by the superintendent.

36 C.F.R. § 2.1(a)(5).

Only one published case, *United States v. Carroll*, 813 F. Supp. 698 (E.D. Mo. 1993), discusses 36 C.F.R. § 2.1(a)(5). In that case, the defendants were charged with conspiracy to violate § 2.1(a)(5) for base-jumping off of the St. Louis Arch, a national monument. *Id.* at 702-703. There is no case law which provides a framework for determining what constitutes a "cultural resource." The National Park Service, however, intended that § 2.1(a)(5) be broadly applied:

The National Park Service believes that the use of broad, generic terms is a better way to provide resource protection. It is the intent to this regulation to protect all natural, cultural, and archeological resources within park areas to leave them unimpaired for the enjoyment of future generations. The listing of specific terms, the Service believes, invites the risk of omitting one, and weakens protection of park resources through a technical omission.

General Regulations for Areas Administered by the National Park Service, 48 Fed. Reg. 30,252, 30,255 (June 30, 1983).

YNP's historic preservation officer, Jeannette Simons ("Simons"), provided an opinion at trial as to what a cultural resource is for § 2.1(a)(5) purposes. Simons stated that:

31

> A cultural resource would be a representation of
> places, materials, building, structures, artifacts that
> are less than 50 years old that have cultural
> significance.

(Doc. 82 at 17.)  In her opinion, the roundhouse, built in 1974,
was considered a cultural resource for § 2.1(a)(5) purposes.
(Doc. 82 at 18.)  This was an improper opinion, as no expert may
offer an opinion which is a legal conclusion.  Fed. R. Evid.
704(a); *Nationwide Transport Finance v. Cass Info. Sys., Inc.*,
523 F.3d 1051, 1058 (9th Cir. 2008) ("[A]n expert witness cannot
give an opinion as to her legal conclusion.").  Whether the
roundhouse was a cultural resource was a mixed question of fact
and law.

Baca did not dispute that he entered the roundhouse. (Doc.
76 at 25.)  He claimed that he had permission to enter; however,
sufficient evidence exists to conclude that Baca did not obtain
permission to enter or film within the roundhouse.  He did not
request permission from any YNP officer.  He claimed that he had
permission to enter, but no tribe elder or member could remember
giving Baca permission to enter.  Baca saw a barrier to the
entrance of the roundhouse and believed that such a barrier was
merely a "suggestion to stay out."  (Doc. 76 at 34-35.)  Baca
also testified that he did not believe the roundhouse to be a
cultural resource because it was built in the 1970's.  (Doc. 76
at 24.)  However, Baca's beliefs are not controlling.

YNP and the tribe treated the roundhouse as a cultural
resource for the holding of religious ceremonies.  The intent of
§ 2.1(a)(5) is to encompass sites that the national park service

determines to be cultural resources.  Here, YNP's national park service determined that the roundhouse was a cultural resource before the litigation.  The tribe also treated the roundhouse as a cultural resource by using it for cleansing and in the "old ways."  Baca did not heed the signs informing the public to stay behind the barrier.  Drawing the evidentiary inferences and credibility findings in favor of the government, sufficient evidence exists to support a finding that Baca violated 36 C.F.R. § 2.1(a)(5), unlawfully entering a cultural resource.

### D.   Defense of The American Indian Religious Freedom Act, 42 U.S.C.A. § 1996

Appellant argues that although he entered the roundhouse if, *arguendo*, it is a cultural resource, he was entitled to do so under The American Indian Religious Freedom Act ("AIRFA"), 42 U.S.C.A. § 1996, which constitutes an affirmative defense, to § 2.1(a)(5).  AIRFA provides:

> On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their interest right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

42 U.S.C.A. § 1996.

Appellant was convicted of entering the roundhouse in violation of 36 C.F.R. § 2.1(a)(5).  The court determined that Baca "entered a cultural resource and that [Baca's] reason for entering had nothing to do with the Indian Traditional Religions Act."  (Doc. 76 at 106.)

33

Appellant challenges this conclusion, arguing that the magistrate judge erred in failing to realize that, as a recognized spiritual leader, AIRFA entitled him to enter the roundhouse.  (Doc. 86 at 23-24.)  Appellant argues that AIRFA "was enacted to protect and preserve the cultural rights and practices relating to Native American religious practices." (Doc. 86 at 23.)  However, the Government rejoins that Appellant's reliance on  AIRFA is misplaced because AIRFA does not create a defense in a criminal case.  (Doc. 95 at 10.)

In *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 455 (1988), the United States Supreme Court considered whether AIRFA expanded American Indians' First Amendment rights.  The Court found that AIRFA did not expand any existing right, such as the First Amendment, and went on to find that AIRFA did not create any judicially enforceable rights under which a compensable claim could be based.  The Court stated:

> Nowhere in the law is there so much as a hint to create a cause of action or <u>any judicially enforceable individual rights</u>.

*Id.* (emphasis added).

The Court held the intent of AIRFA's drafters was "obvious from the face of the statute[,]" which provides that "it shall be the <u>policy</u> of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions ...."  *Lyng*, 485 U.S. at 455; 42 U.S.C.A. § 1996 (emphasis added).  In making its determination, the Court looked to AIRFA's sponsor who stated that "the bill would not 'confer special religious rights on

Indians,' would not 'change any existing State or Federal law,"
and in fact 'has no teeth in it.'" *Lyng*, 485 U.S. at 455 (quoting
124 Cong. Rec. 21444, 21445 (1978)).

The Ninth Circuit does not depart from this ruling.
*Henderson v. Terhune*, 379 F.3d 709, 711 (9th Cir. 2004), affirmed
the conclusion that a defendant could not state an actionable
claim under AIRFA.  The court found that "AIRFA is simply a
policy statement and does not create a cause of action or any
judicially enforceable individual rights."  *Id.; see also United
States v. Mitchell*, 502 F.3d 931, 949 (9th Cir. 2007) (quoting
*Henderson*, 379 F.3d at 711).  Accordingly, the magistrate judge
properly found AIRFA did not create an enforceable individual
religious right in Appellant, which provided a defense to a
violation of 36 C.F.R. § 2.1(a)(5).  AIRFA does not provide
Appellant an affirmative defense to or exemption from unlawfully
traversing a cultural resource.

## VII.  CONCLUSION

"The goal of § 455(a) is to avoid even the appearance of
partiality."  *Liljeberg*, 486 U.S. at 860.  "[T]he . . . purpose
of [the law] is to promote confidence in the judiciary by
avoiding even the appearance of impropriety whenever possible."
*Id.* at 865.  The judge's conduct created the circumstances under
which the appearance of his impartiality could reasonably and
objectively be questioned.  A prominently displayed hangman's
noose has no place in a federal magistrate judge's judicial
chambers, a public office, nor in a newspaper article authorized

by the judge, no matter what its personal significance to the judge.  It is a judge's obligation to be a guardian of liberty and to always strive to assure the appearance of impartiality.  Appellant properly raised the issue.  Public confidence in the appearance of fairness and impartiality of a Judge is too crucial to allow it to be compromised.

1.  The defendant's recusal motion is GRANTED.  The judgments of conviction are REVERSED and the case is REMANDED for retrial before a different Magistrate Judge.

2.  If the government chooses to retry the case, it shall do so in accordance with the requirements of law within the time proscribed by law following entry of this decision.


SO ORDERED
Dated:  April 14, 2009


                          ____/s/ Oliver W. Wanger____
                              Oliver W. Wanger
                         United States District Judge